STATE OF NORTH CAROLINA v. KHOSROW PARMAEI

No. COA06-120

(Filed 7 November 2006)

## 1. Appeal and Error— appealability—plain error—failure to challenge jury instructions or evidentiary matters

Although defendant contends the trial court committed plain error in a first-degree murder case by not allowing the jury to question trial witnesses, this assignment of error is dismissed because: (1) defendant's assignment of error does not challenge jury instructions or an evidentiary matter; and (2) application of the plain error doctrine is limited to jury instructions and evidentiary matters.

## 2. Constitutional Law— effective assistance of counsel—dismissal of claim without prejudice

Defendant's claim of ineffective assistance of counsel in a first-degree murder case based on his counsel's agreement with the trial court that jurors are not allowed to question witnesses during trial is dismissed without prejudice to defendant to move for appropriate relief and to request a hearing to determine whether he received effective assistance of counsel, because the record is inadequate at this stage of review.

STATE v. PARMAEI

[180 N.C. App. 179 (2006)]

**3. Evidence— prior crimes or bad acts—violence toward victim—intent—absence of accident—remoteness**

    The trial court did not err in a first-degree murder case by allowing testimony of defendant's prior acts of violence toward the victim, because: (1) the testimony was admissible to prove either defendant's intent to harm the victim or an absence of accident; and (2) defendant opened the door to the testimony of events that occurred fourteen years prior to the murder, and remoteness in time goes to the weight and not admissibility.

Appeal by defendant from judgment entered 3 September 2004 by Judge Ronald K. Payne in Buncombe County Superior Court. Heard in the Court of Appeals 18 October 2006.

*Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant-appellant.*

TYSON, Judge.

Khosrow Parmaei ("defendant") appeals from judgment entered after a jury found him to be guilty of one count of first-degree murder. We find no error.

## I. Background

In April 1986, defendant and Meg Parmaei ("Meg") were married in Birmingham, Alabama. Defendant and Meg procreated a daughter, Maryahm Parmaei ("Maryahm") born 24 March 1990. Meg had been previously married and had bore four children during that marriage.

In February 2002, defendant, Meg, and Maryahm were living in Black Mountain, North Carolina. Two of Meg's daughters by prior marriage, Tiffany Sims ("Tiffany") and Christiane Smith ("Christiane"), were living nearby in Asheville, North Carolina.

Defendant's home in Black Mountain contains several guest bedrooms, Maryahm's bedroom, and defendant's and Meg's master bedroom. The room adjoining the master bedroom was used as a studio. In that room, Meg made quilts and had installed a computer upon which Meg was writing a book. Defendant and Meg entered their bathroom and shower from the studio room. The studio contained a sliding glass door and a pair of windows installed in the outside wall.

STATE v. PARMAEI

[180 N.C. App. 179 (2006)]

On 3 February 2002 at 3:15 a.m. Buncombe County Paramedic Randy Boggs ("Boggs") received a call to respond to the home. Boggs entered the studio through the sliding glass door and observed Meg lying on her back, inside a sleeping bag on the floor. Meg's body was cool and she appeared to have been dead for over forty-five minutes. Boggs observed a piece of cloth over Meg's mouth and nose. Dr. Patrick Lantz performed the autopsy and testified Meg's cause of death was due to asphyxiation by manual strangulation.

## A. Christiane's Testimony

The State's evidence tended to show that in the months prior to February 2002, Meg was upset with defendant and planned to separate from and divorce him. Christiane testified that in the week prior to 3 February 2002, Meg had asked Christiane to come help Meg move a bed from a guest bedroom into the studio. Meg could not afford a separate residence and planned to move a bed into the studio and share custody of Maryahm with defendant.

On 2 February 2002, Christiane arrived to help Meg move a bed into the studio. She heard defendant and Meg arguing. Defendant angrily told Meg he would not allow Maryahm to be taken away from him. Later that evening, Christiane asked Meg to return with her to Asheville. Meg declined because she would not leave Maryahm alone with defendant. Meg would not take Maryahm with her and Christiane, because defendant would become more upset.

The State also introduced an email into evidence written on 5 December 2001 between Meg and her brother, Mike, which stated:

> Although I think [defendant] is a real jerk and he gets on my nerves and treats me like shit, he is Maryahm's father and I don't think it is fair to remove her from her current crising (sic) status. If he treats me like he treats her, things will probably be much different.

> Ideally, I will be able to find a place very near where [Maryahm] can go back and forth between us while staying in the same school and maintaining her swim practice schedule . . . .

## B. Maryahm's Testimony

Maryahm was eleven-years-old at the time of trial. On 2 February 2002, Maryahm's friend visited during the day. At approximately 8:00 p.m., defendant drove Maryahm and her friend to meet her friend's parents at a Food Lion Supermarket, located approximately one mile

from the home. After dropping off the friend, defendant told Maryahm, "I'd know what a father meant and I'd appreciate a father one day."

Maryahm also testified she had heard her mother, Meg, tell defendant she wanted to separate and get a divorce. Maryahm testified Meg had previously separated from defendant, but returned home because "she wouldn't leave me alone with him." Maryahm testified defendant reacted badly to Meg moving the bed into the studio. Maryahm testified, "[Defendant] reacted in a very bad way. [Defendant] kind of ignored us, ignored the fact that they were even moving anything, didn't talk much, just stomped around and did his own thing."

### C. Detective Ribley's Testimony

Black Mountain Police Department Detective Lee Ribley ("Detective Ribley") also testified for the State. Detective Ribley arrived at the home at 3:40 a.m. on 3 February 2002. Detective Ribley observed Meg's body and noted cuts and abrasions on her face and a small amount of blood "consistent with coming from those little cuts and abrasions." Detective Ribley also observed two pillowcases on Meg's bed, one of which appeared to have blood on both sides.

Detective Ribley also obtained information from defendant. Defendant told Detective Ribley he came into the room during the night, found a window wide open, and also found Meg in the same condition as when Detective Ribley arrived. Detective Ribley investigated whether anyone had entered the home through the open window in the studio. Detective Ribley found a heavy layer of dust covering the window shelf inside and outside the studio wall. Nothing outside the home or below the open window tended to show a person had climbed into or out of the window. No other signs indicated a forced entry into the home.

### D. Defendant's Testimony

Defendant testified and presented evidence in his defense. Defendant disputed the testimony from Christiane that he and Meg were arguing when she arrived on 2 February 2002. Defendant testified he was building a tree house for Maryahm when Christiane came to the home. Defendant did not argue with Meg that afternoon and did not know Meg had planned to separate from him.

Defendant also testified about Meg and Christiane moving a bed from a guest room into the studio. Defendant stated he and Meg had

STATE v. PARMAEI

[180 N.C. App. 179 (2006)]

discussed moving a bed from the guest room to the studio so defendant would also have an office to work. Meg would sleep in the studio bed, after she often worked late in the studio.

Defendant testified about the events that occurred during the evening of 2 February 2002 and the early morning hours of 3 February 2002. Defendant took Maryahm and her friend to met her friend's parents at Food Lion. Defendant told Maryahm, "One day you will appreciate your dad, what I'm doing for you." Defendant and Maryahm returned home.

Meg and Christiane were moving items, including a bed, from a guest room into Meg's studio. Defendant gathered some tools and told Meg he was "going out" and would be right back. Defendant went to Tomahawk Lake to run laps, visited a neighbor's house, and returned home.

When defendant returned home he saw Meg, Christiane, and Maryahm watching a movie. Defendant testified he was not interested in the movie, prepared a pizza, and went to the master bedroom to watch television. Christiane left the home about 10:00 p.m. Shortly after 10:00 p.m., Meg put Maryahm to bed. Defendant took a shower in the studio bathroom. After showering, defendant went to the master bedroom, watched television, and worked on his laptop computer. Meg eventually came to the door of the master bedroom and asked defendant if he needed to use the studio bathroom again that night. Defendant said he did not and Meg closed the door. Defendant fell asleep watching television.

Later in the evening, defendant awoke to use the bathroom. Defendant testified he opened the door and walked straight to the studio bathroom. After using the bathroom, while walking back to the master bedroom, he began to see "unusual things." The window was open and he saw Meg inside a sleeping bag. Defendant saw that Meg's hand was purple in color. Defendant checked on Maryahm, who was safely asleep. Defendant dialed 9-1-1 on a cordless telephone. Defendant denied killing Meg.

Defendant was indicted for the first-degree murder on 6 May 2002. Defendant was tried in April 2004. On 15 April 2004, the jury was hopelessly deadlocked and a mistrial was declared. Defendant was tried for a second time in August 2004. The jury found defendant to be guilty of first-degree murder. Defendant was sentenced to life imprisonment without parole and appeals.

## II.  Issues

Defendant argues: (1) the trial court committed plain error by not allowing the jury to question trial witnesses; (2) his defense counsel's concurrence with the trial court's ruling that jurors are not allowed to question witnesses during trial constituted ineffective assistance of counsel; and (3) the trial court erred by allowing testimony of his prior acts of violence towards Meg.

## III.  Jury Questioning of Witnesses

**[1]** The jury sent the trial judge a note at the beginning of the trial and asked whether jurors were permitted to ask witnesses follow-up questions. The trial court responded "no," but that jurors could ask witnesses to repeat an answer they did not hear it. Defense counsel failed to object and agreed it was not the role of the jury to ask questions. Defendant contends the trial court committed plain error when it failed to allow the jury to question trial witnesses. We disagree.

Our Supreme Court discussed the application of plain error review in *State v. Anderson*, 355 N.C. 136, 558 S.E.2d 87 (2002).

> Generally, a purported error, even one of constitutional magnitude, that is not raised and ruled upon in the trial court is waived and will not be considered on appeal. [T]he rule is that when defendant fails to object during trial, he has waived his right to complain further on appeal. Rule 10(c)(4) of our Rules of Appellate Procedure provides that an alleged error not otherwise properly preserved may, nevertheless, be reviewed if the defendant specifically and distinctly contends that it amounted to plain error. This Court has recognized that the plain error rule applies only in truly exceptional cases and that a defendant relying on the rule bears the heavy burden of showing . . . (i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial . . . . Moreover, this Court has previously limited application of the plain error doctrine to jury instructions and evidentiary matters.

*Id.* at 142, 558 S.E.2d at 92 (internal citations and quotations omitted).

Defendant failed to object to the trial judge's denial of the jury's request to question trial witnesses. Defendant's assigned error is not preserved for our review. N.C.R. App. P. 10 (2006). Further, defendant's assignment of error does not challenge jury instructions or an evidentiary matter. Application of the plain error doctrine is limited

to jury instructions and evidentiary matters. *State v. Atkins*, 349 N.C. 62, 81, 505 S.E.2d 97, 109 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). Defendant's assignment of error is not reviewable under the limited scope of plain error review and is dismissed.

## IV.  Ineffective Assistance of Counsel

[2] Defendant contends his trial counsel's statement that "the state of the law" does not allow the jury to question witnesses is error and "[d]efense counsel's professional error was deficient performance."

*State v. Braswell* sets out a two-part test to resolve issues regarding ineffective assistance of counsel. 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984)). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698.

This Court has stated, "claims of ineffective assistance of counsel should be considered through motions for appropriate relief and not on direct appeal." *State v. Stroud*, 147 N.C. App. 549, 553, 557 S.E.2d 544, 547 (2001), *cert. denied*, 356 N.C. 623, 575 S.E.2d 758 (2002). The reasons for this rule are to develop a factual record and "in order to defend against ineffective assistance of counsel allegations, the State must rely on information provided by defendant to trial counsel, as well as defendant's thoughts, concerns, and demeanor." *Id.* at 554, 557 S.E.2d at 547 (quoting *State v. Buckner*, 351 N.C. 401, 412, 527 S.E.2d 307, 314 (2000)).

An ineffective assistance of counsel claim may be brought on direct review "when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or

an evidentiary hearing." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001) (citations omitted), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).

Here, the record is insufficient for us to review and rule on defendant's ineffective assistance of counsel claim. The transcripts and record are insufficient for us to determine whether defense counsel's actions resulted from trial tactics and strategy or from a lack of preparation or an unfamiliarity with the legal issues. The transcripts and records are also insufficient for us to determine whether defense counsel's actions prejudiced his defense. We decline to reach defendant's ineffective assistance of counsel assignment of error because the record is inadequate at this stage of review. This assignment of error is dismissed.

Our dismissal of this assignment of error is without prejudice to defendant to move for appropriate relief and to request a hearing to determine whether he received effective assistance of counsel. *See State v. Dockery*, 78 N.C. App. 190, 192, 336 S.E.2d 719, 721 (1985) ("The accepted practice is to raise claims of ineffective assistance of counsel in post-conviction proceedings, rather than direct appeal." (citing *e.g., State v. Vickers*, 306 N.C. 90, 291 S.E.2d 599 (1982)).

## V. Prior Acts Evidence

**[3]** Defendant contends the trial court erred by allowing testimony of his alleged prior acts of violence towards Meg. Over defense counsel's objection, Meg's two daughters by prior marriage, Christiane and Tiffany, were allowed to testify about alleged prior acts of violence by defendant towards Meg.

### A. Christiane's Testimony

Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, *identity, or absence of mistake*, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2005) (emphasis supplied).

Our Supreme Court has stated:

Rule 404(b) state[s] a clear general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject

to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

After a Rule 404(b) hearing outside the presence of the jury, Christiane was allowed to testify about two prior acts of violence by defendant toward Meg in 1997. One incident involved defendant allegedly pushing Meg in front of a moving vehicle, the other asserted defendant attempted to strike Meg with a piece of firewood. Christiane's testimony of both incidents was allowed as proper Rule 404(b̃) evidence. Defendant contends allowing this testimony was error because the alleged bad acts were too remote in time and lacked factual similarities.

Christiane's testimony was admissible to prove either defendant's intent to harm Meg or an absence of accident. "Evidence of previous threats is admissible in trials for first-degree murder to prove premeditation and deliberation. The remoteness in time of the threat goes to its weight and does not make it inadmissible." *State v. Cox*, 344 N.C. 184, 188, 472 S.E.2d 760, 762 (1996) (citing *State v.' Myers*, 299 N.C. 671, 675, 263 S.E.2d 768, 771 (1980)). This assignment of error is overruled.

### B.  Tiffany's Testimony

Over objection, Tiffany was allowed to testify defendant had thrown a record player at Meg during an argument that occurred fourteen years prior to the murder. Tiffany's testimony was allowed on the basis defendant had opened the door to Tiffany's testimony during cross-examination. Defense counsel asked Christiane:

Q.  You did not witness any acts of domestic violence by [defendant] against your mother since—ever, have you?

A.  Yes.

Q.  Not since 1997?

A.  Since 1997, no.

As noted, remoteness in time goes to the weight not admissibility. *Id.* The trial court correctly ruled defendant had opened the door to the State's subsequent questions to Tiffany concerning defendant's prior acts of violence toward Meg. *See State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981) ("[T]he law wisely permits

evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself."). This assignment of error is overruled.

## VI.   Conclusion

Defendant failed to preserve for appellate review any error in the trial court denying the jury's request to question trial witnesses. This assignment of error is not reviewable under plain error review and is dismissed. Defendant's claim of ineffective assistance of counsel is not properly before us and is dismissed without prejudice.

The trial court did not err by allowing testimony of defendant's prior acts of violence towards the victim under Rule 404(b). Defendant opened the door to the testimony of events that occurred fourteen years prior to the murder. Defendant received a fair trial free from the errors he preserved, assigned, and argued.

No Error.

Judges BRYANT and LEVINSON concur.