STATE v. PEMBERTON

[228 N.C. App. 234 (2013)]

---

STATE OF NORTH CAROLINA
v.
DEVONTE TERRELL PEMBERTON

No. COA12-1528

Filed 2 July 2013

**1. Constitutional Law—effective assistance of counsel—admission of guilt**

Defendant's ineffective assistance of counsel claim in a first-degree murder case stemming from his trial counsel's alleged admission of his guilt to first degree murder under the felony murder rule lacked merit. It was not necessary to decide whether the factual admissions made by defendant's trial counsel were tantamount to an admission of his guilt of first-degree murder on the basis of the felony murder rule given that defendant expressly consented to the strategy employed and the admissions made by his trial counsel.

**2. Constitutional Law—effective assistance of counsel—reasonableness of defense theory**

Defendant's ineffective assistance of counsel claim in a first-degree murder case stemming from his challenge to the reasonableness of the theory of defense adopted by his trial counsel was dismissed without prejudice to his right to assert that claim in a subsequent motion for appropriate relief. The trial court's sentence was vacated and remanded for resentencing.

**3. Constitutional Law—cruel and unusual punishment—life imprisonment without parole—under 18 years old at time of crime**

The trial court violated defendant's state and federal constitutional right to be free from cruel and unusual punishment in a

first-degree murder case by imposing a mandatory sentence of life imprisonment without the possibility of parole upon him despite the fact that he was under 18 years of age at the time of the murder. The trial court's sentence was vacated and remanded for resentencing defendant to life imprisonment with parole.

Appeal by defendant from judgment entered 12 October 2011[1] by Judge Paul Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 22 May 2013.

*Attorney General Roy Cooper, by Assistant Attorney General Derrick C. Mertz, for the State.*

*Brock, Payne & Meece, P.A., by C. Scott Holmes, for Defendant-Appellant.*

ERVIN, Judge.

Defendant Devonte Terrell Pemberton appeals from a judgment sentencing him to life imprisonment without the possibility of parole based upon his conviction for first degree murder. On appeal, Defendant argues that he was deprived of his right to the effective assistance of counsel based upon the fact that his trial counsel admitted the existence of all of the elements of felony murder as the result of an apparent misunderstanding of the applicable law, that he was deprived of his right to the effective assistance of counsel based upon his trial counsel's decision to advance a theory of defense that lacked adequate support in the record or the applicable law, and that he was impermissibly subjected to cruel and unusual punishment stemming from the imposition of a mandatory sentence of life imprisonment without the possibility of parole despite the fact that he was less than eighteen years of age at the time that he committed the murder for which he was convicted. After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we conclude that Defendant's ineffective assistance of counsel claim stemming from his trial counsel's alleged admission of his guilt to first degree murder under the felony murder rule lacks merit, that his ineffective assistance of counsel claim stemming from his challenge to the reasonableness of the theory of defense adopted by his trial counsel should be dismissed without prejudice to

---

1. The Judgment and Commitment is erroneously dated 4 October 2011. According to the transcript, judgment was entered on the same date that the verdict was rendered.

his right to assert that claim in a subsequent motion for appropriate relief, and that the trial court's sentence should be vacated and this case remanded to the Wake County Superior Court for resentencing.

## I. Factual Background

### A. Substantive Facts

On 9 May 2010, Dahshon Crudup and Damon Gresham were at Laquavis Jordan's house on Colleton Road and Oakwood Avenue in Raleigh. At that time, Mr. Crudup and Mr. Gresham discussed robbing Reginald Dunn, who was Mr. Crudup's "drug connect." During this discussion, Mr. Crudup suggested that they call Mr. Dunn for the purpose of setting up a drug transaction in order to lure Mr. Dunn to a spot at which they could rob him. After Mr. Gresham pointed out that the group did not have a gun for use in this enterprise, Mr. Jordan called over to Cordell Milbourne, who was standing outside his sister's house with Defendant and Telvin Burnette and asked if Mr. Milbourne knew where one could get a gun for use in a robbery. After contacting someone on his cell phone, Mr. Milbourne gave Mr. Jordan an affirmative answer.

At that point, Defendant, Mr. Crudup, Mr. Gresham, Mr. Milbourne, and Mr. Burnette drove to the residence of Mr. Milbourne's friend in Mr. Crudup's 1996 green Lexus ES300 for the purpose of retrieving the gun. The five men traveled in Mr. Crudup's Lexus to Walnut Terrace, where they parked near the basketball courts. Mr. Milbourne and Defendant got out of the car and went to the basketball courts, where they met with a man called "Savage." After encountering "Savage," Mr. Milbourne went to an apartment, where he remained for approximately ten minutes, to get the gun. At the time that he returned to the green Lexus, Mr. Milbourne carried a large, black revolver.

As the five young men drove away from Walnut Terrace, Mr. Dunn called Mr. Crudup's cell phone and arranged to meet him at the Melvid Court apartment complex. At approximately 4:00 p.m., the group arrived at Melvid Court. After noticing another green Lexus at Melvid Court and stating that Mr. Dunn would recognize his green Lexus, Mr. Crudup decided to drive across the street to another housing complex off of Dacian Road and park at that location. Mr. Crudup elected to park at the Dacian Road complex because he did not want Mr. Dunn to see the group of young men in the vehicle and realize that "something was up."

Although Mr. Crudup told Mr. Gresham to rob Mr. Dunn, Mr. Gresham expressed concern about doing so by himself. According to Mr. Crudup and Mr. Milbourne, Defendant agreed to accompany Mr. Gresham. At

that point, Mr. Milbourne testified that he passed the gun to Defendant, who exited the vehicle. Mr. Gresham took Mr. Crudup's cell phone with him so that he could keep in contact with Mr. Dunn. In addition, both Mr. Gresham and Defendant took one of Mr. Crudup's hats for the purpose of covering their hair and face. More specifically, Mr. Gresham took a Red Sox hat while Defendant took an Oakland A's hat.

At approximately 4:20 p.m., Defendant and Mr. Gresham walked over to Melvid Court. An individual named Zuri Twine had given Mr. Dunn a ride to Melvid Court. After receiving a call from Mr. Dunn, Mr. Gresham told Mr. Dunn to park by the green Lexus in the Melvid Court parking lot. As he pulled into that parking lot, Mr. Twine noticed a green Lexus and parked beside it. At the time that he arrived at Melvid Court, Mr. Twine observed two young African-American men sitting at the playground, both of whom were wearing hats. One of the two men was tall and light-skinned, like Defendant, and the other had a darker complexion, like Mr. Gresham.

After getting out of Mr. Twine's car, Mr. Dunn walked down the sidewalk and approached Defendant and Mr. Gresham, who were standing next to each other. At that point, Mr. Dunn inquired about Mr. Crudup. According to Mr. Gresham, Defendant pulled out the gun and started firing as Mr. Dunn turned to run away. Although the first shot hit the ground, the second shot struck Mr. Dunn in the back, causing him to fall. After Mr. Gresham turned to run, he heard two more shots. When Mr. Gresham looked back toward the scene of the shooting, Defendant was running behind him and Mr. Dunn was lying on the ground. As he and Defendant fled, Mr. Gresham lost Mr. Crudup's Red Sox hat.

After Defendant and Mr. Gresham returned to Mr. Crudup's green Lexus and entered the vehicle, the three other young men confirmed that they had heard three to five gunshots. Although Defendant admitted that he had shot Mr. Dunn, he expressed uncertainty as to whether Mr. Dunn was dead. At a later time, Defendant also told Mr. Milbourne, who is his cousin, that he had shot Mr. Dunn. When Mr. Milbourne inquired if Defendant and Mr. Gresham had taken any drugs or money from Mr. Dunn, the two men admitted that they had not obtained anything before fleeing the scene. During the drive back to Colleton Road, Defendant threw Mr. Crudup's Oakland A's hat out of the window between two wooded areas on a street off of New Bern Avenue. Upon their arrival at Colleton Road, Defendant gave the gun back to Mr. Milbourne and the group separated, with Mr. Milbourne, Mr. Burnette, and Defendant returning to Mr. Milbourne's sister's house.

A call seeking emergency assistance at Melvid Court was made at 4:23 p.m. Within two minutes, law enforcement officers and emergency medical personnel arrived at the scene. Although Mr. Dunn was rushed to the hospital, he died while undergoing surgery without having made any statement identifying who had shot him. The medical examiner determined that Mr. Dunn died as the result of gunshot wounds.

Although investigating officers did not find any drugs or money on Mr. Dunn's person, they did locate his cell phone and determined that the last several calls made and received on that phone had originated from or terminated to Mr. Crudup's phone. In addition, investigating officers determined that Mr. Crudup owned a green Lexus. The Red Sox hat that Mr. Gresham had been wearing was recovered at the scene of the shooting as well. Although investigating officers collected a small bag containing 3.86 grams of crack cocaine and a bullet from the Melvid Court area, there were no fingerprints on the baggie.

After calling the numbers stored in Mr. Dunn's phone, investigating officers located Mr. Twine, who told them that Mr. Dunn had planned to meet a male individual in a green Lexus at the time that he was killed. On the following day, the police found Mr. Crudup and placed him under arrest after finding unlawful controlled substances in his green Lexus. Although he initially denied having any knowledge of Mr. Dunn's murder, Mr. Crudup later provided investigating officers the names of some of the individuals involved in the commission of that offense. In addition, Mr. Crudup told investigating officers that Defendant had been wearing his Oakland A's hat and helped them locate it in the area where Defendant had thrown it out of Mr. Crudup's green Lexus. A DNA analysis indicated that DNA from both Mr. Gresham and Mr. Crudup was found on the Red Sox hat. Defendant's DNA constituted the predominant profile found on the Oakland A's hat, although Mr. Crudup's DNA could not be excluded from the material collected from that hat.

Detective Kevin Norman of the Raleigh Police Department interviewed Defendant on 12 May 2010. At that time, Defendant claimed to have been at Mr. Milbourne's house all day on 9 May 2010. In addition, Defendant denied knowing either Mr. Crudup or Mr. Gresham and denied having worn Mr. Crudup's Oakland A's hat. However, Defendant did volunteer, without any prompting, that he had heard about the murder in Melvid Court.

At trial, Mr. Crudup testified that he had received at least three letters from Defendant while the two of them were in custody awaiting trial. In one letter, Defendant wrote, "I mean a peter roll won't supposed to come

out, but sh*t, the n***** tried to run[.]" According to Mr. Crudup, this statement meant that a murder was not supposed to happen and that Mr. Dunn had been killed because he had tried to run away. In a second letter, Defendant accused Mr. Crudup of cooperating with the police and blamed his incarceration on Mr. Crudup's actions. Although Defendant acknowledged that Mr. Crudup had not pulled the trigger, he asserted that everyone knew that, when a robbery is being committed, someone "might have to shoot somebody" and stated that the entire group was "going down" if Mr. Crudup continued to cooperate with investigating officers. In the third letter, Defendant reiterated that he knew Mr. Crudup was cooperating with investigating officers and wrote that, "y'all is food now because of some s**t y'all know y'all won't supposed to say." By making this statement, Defendant was asserting that, although he and Mr. Crudup were members of different sets in the Bloods gang, the two men were not supposed to be informing on each other. At another point in the same letter, Defendant wrote, "I'm gonna take a plea. But if y'all trying to help bring me down, prepare to go to trial, and we all going down."

### B. Procedural History

On 12 May 2010, a warrant for arrest was issued charging Defendant with the murder of Mr. Dunn. On 7 June 2010, the Wake County grand jury returned a bill of indictment charging Defendant with the first degree murder of Mr. Dunn. The charge against Defendant came on for trial before the trial court and a jury at the 3 October 2011 Criminal Session of Wake County Superior Court. On 12 October 2011, the jury returned a verdict convicting Defendant of first degree murder on the basis of the felony murder rule, with robbery with a dangerous weapon serving as the predicate felony. Based upon the jury's verdict, the trial court sentenced Defendant to life imprisonment without the possibility of parole. Defendant noted an appeal to this Court from the trial court's judgment.

### II. Legal Analysis

### A. Ineffective Assistance of Counsel

In his initial challenge to the trial court's judgment, Defendant asserts that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 19 and 23 of the North Carolina Constitution. U.S. Const. amend. VI; U.S. Const. amend. XIV; N.C. Const. Art. I, §§ 19, 23; *State v. Baker*, 109 N.C. App. 643, 644, 428 S.E.2d 476, 477, *disc. review denied*, 334 N.C. 435, 433 S.E.2d 180 (1993). More specifically, Defendant argues that he was deprived of the effective assistance of counsel (1) when

his trial counsel admitted the existence of each element of the offense of first degree murder based on the felony murder rule and (2) when the defense mounted by his trial counsel rested upon a theory of the case which lacked support in either the applicable law or the evidentiary record and upon evidence which Defendant's trial counsel promised to present and then never introduced. We do not believe that Defendant is entitled to relief on the basis of these ineffective assistance of counsel claims on direct appeal given that the first claim is without merit and that the second claim cannot be adequately evaluated without further development of the record.

### 1. Applicable Legal Principles

" 'In order to' obtain relief on the basis of an ineffective assistance of counsel claim, Defendant is required to demonstrate that his trial counsel's performance was deficient and that this deficient performance 'prejudiced the defense.' " *State v. Best*, ___ N.C. App. ___, ___, 713 S.E.2d 556, 562 (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984)), *disc. review denied*, 365 N.C. 361, 718 S.E.2d 397 (2011). The United States Supreme Court has articulated a two-part test for use in determining if a defendant is entitled to relief on ineffective assistance of counsel grounds.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693 (1984). "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. The adequacy of the representation provided by the defendant's counsel hinges upon "whether counsel's conduct so undermined the proper functioning of adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S. Ct. at 2064, 80 L. Ed. 2d at 692-93. The ultimate issue that must be resolved in determining whether any deficient performance by the defendant's trial counsel was sufficiently prejudicial to necessitate an

award of relief is whether "there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings." *State v. Banks,* 210 N.C. App. 30, 49, 706 S.E.2d 807, 821 (2011) (quoting *State v. Braswell,* 312 N.C. 553, 563, 324 S.E.2d 241, 248 (1985)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Poindexter,* 359 N.C. 287, 291, 608 S.E.2d 761, 764 (2005) (citing *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S. Ct. 2527, 2542, 156 L. Ed. 2d 471, 493 (2003) (quoting *Strickland,* 466 U.S. 694, 104 S. Ct. at 2068, 80 L. Ed. 2d 698)).

As a general proposition, reviewing courts do not second-guess the strategic or tactical decisions made by a defendant's counsel. *State v. Prevatte,* 356 N.C. 178, 236, 570 S.E.2d 440, 472 (2002), *cert. denied,* 538 U.S. 986, 123 S. Ct. 1800, 155 L. Ed. 2d 681 (2003); *see also State v. Lesane,* 137 N.C. App. 234, 246, 528 S.E.2d 37, 45 (200) (stating that "[t]he decision whether or not to develop a particular defense is a tactical decision" that is not to be "second-guessed,"), *disc. review denied,* 352 N.C. 154, 544 S.E.2d 236 (2000). For that reason, in evaluating ineffective assistance claims stemming from challenges to strategic and tactical decisions made prior to and during trial, a defendant's trial counsel "is given wide latitude. . . and the burden to show that counsel's performance fell short of the required standard is a heavy one for defendant to bear." *State v. Fletcher,* 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001), *cert. denied,* 537 U.S. 846, 123 S. Ct. 184, 154 L. Ed. 2d 73 (2002). The deference shown to a defense attorney's strategic and tactical decisions stems from an acknowledgement that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 695. As a result, a reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Mason,* 337 N.C. 165, 178, 446 S.E.2d 58, 65 (1994) (quoting *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065, 80 L. Ed. 2d at 695).

The strategic and tactical decisions made by a defendant's trial counsel can, however, be so unreasonable as to result in the provision of constitutionally deficient representation. For example, in *State v. Moorman,* 320 N.C. 387, 400, 358 S.E.2d 502, 510 (1987), the Supreme Court held that the decision by the defendant's trial counsel to advance a theory of defense which had no basis in fact constituted deficient representation. In addition, according to well-established law, a defendant is entitled to relief on ineffective assistance of counsel grounds without a

showing of actual prejudice in the event that his or her trial counsel con-
cedes the defendant's guilt of a criminal offense without consent. *State
v. Harbison*, 315 N.C. 175, 180-81, 337 S.E.2d 504, 507-08 (1985), *cert.
denied*, 476 U.S. 1123, 106 S. Ct. 1992, 90 L. Ed. 2d 672 (1986). However,
in the event that the "facts [in the record] must show, at a minimum,
that defendant *knew* his counsel [was] going to make such a conces-
sion," counsel is entitled to concede his or her client's guilt of a criminal
offense. *State v. Matthews*, 358 N.C. 102, 109, 591 S.E.2d 535, 540 (2004).

As a general proposition, an ineffective assistance of counsel claim
should be asserted through the filing and litigation of a motion for appro-
priate relief, during the course of which an adequate factual record can
be developed, rather than during the course of a direct appeal. *State
v. Stroud*, 147 N.C. App. 549, 553-56, 557 S.E.2d 544, 547-48 (2001), *cert.
denied*, 356 N.C. 623, 575 S.E.2d 758 (2002); *see also State v. Parmaei*, 180
N.C. App. 179, 185, 636 S.E.2d 322, 326 (2006), *disc. review denied*, 361
N.C. 366, 646 S.E.2d 547 (2007). The preference for the assertion of inef-
fective assistance of counsel claims in postconviction proceedings rather
than on direct appeal inherent in numerous decisions by this Court and the
Supreme Court stems from the fact that evidence concerning the nature
and extent of the information available to the defendant's trial counsel at
the time that certain decisions were made and the fact that information
concerning any discussions that took place between the defendant and
his or her trial counsel, while needed in evaluating the validity of the inef-
fective assistance of counsel claim under consideration, are generally not
contained in the record presented to a reviewing court on direct appeal.
In other words, when an ineffective assistance of counsel claim

> is brought on direct appeal, appellate counsel and the court
> must proceed on a trial record not developed precisely for
> the object of litigating or preserving the claim and thus
> often incomplete or inadequate for this purpose . . . If the
> alleged error is one of commission, the record may reflect
> the action taken by counsel but not the reasons for it. The
> appellate court may have no way of knowing whether a
> seemingly unusual or misguided action by counsel had
> a sound strategic motive or was taken because the coun-
> sel's alternatives were even worse.

*Massaro v. United States*, 538 U.S. 500, 504-05, 123 S. Ct. 1690, 1694, 155
L. Ed. 2d 714, 720 (2003). As a result,

> It is well established that ineffective assistance of coun-
> sel claims "brought on direct review will be decided on

the merits when the cold record reveals that no further investigation is required, i.e. claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." [However], when this Court reviews ineffective assistance of counsel claims on direct appeal and determines that they have been brought prematurely, we dismiss those claims without prejudice, allowing defendant to bring them pursuant to a subsequent motion for appropriate relief in the trial court.

*State v. Thompson*, 359 N.C. 77, 122-23, 604 S.E.2d 850, 881 (2004) (citation omitted) (quoting *State v. Fair*, 354 N.C. 131, 166, 577 S.E.2d 500, 524 (2001), *cert. denied*, 535 U.S. 1114, 122 S. Ct. 2332, 153 L. Ed 2d 162 (2002)), *cert. denied*, 546 U.S. 830, 126 S. Ct. 48, 163 L. Ed. 2d 80 (2005). We will now utilize these basic legal principles to analyze Defendant's ineffective assistance of counsel claims.

### 2. *Harbison* Claim

[1] As we have already noted, Defendant contends that his trial counsel provided him with constitutionally deficient representation by conceding the existence of each of the elements which the State was required to establish in order to show his guilt of first degree murder under the felony murder rule. We do not believe that Defendant is entitled to relief on the basis of this contention.

Although Defendant's trial counsel never explicitly conceded her client's guilt of any offense during the course of the trial, she did make a number of factual concessions during the course of the trial proceedings, including admitting that Defendant had been present at the scene of the shooting of Mr. Dunn and that Defendant believed that he was participating in a plan to commit a robbery. However, we need not decide whether the factual admissions made by Defendant's trial counsel were tantamount to an admission of Defendant's guilt of first degree murder on the basis of the felony murder rule given that Defendant expressly consented to the strategy employed and the admissions made by his trial counsel.

After the State asserted that the admissions made by Defendant's trial counsel established his guilt of first degree murder under the felony murder rule, the trial court conducted an inquiry for the purpose of determining whether Defendant's trial counsel had made these admissions with the consent of her client. At that hearing, Defendant acknowledged an awareness that his trial counsel intended to admit that he had been present at the scene of the shooting, that he had been present when

the group went to get a gun, and that he had willingly exited Mr. Crudup's green Lexus with the belief that the group was going to be committing a robbery. However, the record also reflects that Defendant's trial counsel made these admissions in accordance with a trial strategy during which she planned to challenge certain self-serving statements made by the testifying co-defendants, assert that Defendant had not been the individual who fired the shots that killed Mr. Dunn, and argue that Defendant was not the shooter and that the chain of events which led to the death of Mr. Dunn was never, contrary to Defendant's belief, supposed to result in a robbery. In other words, Defendant's trial counsel intended to attempt to persuade the jury to refrain from convicting Defendant of first degree murder on the grounds that he did not intend to or actually kill Mr. Dunn and that, since the killing of Mr. Dunn resulted from a separate plan to murder him of which Defendant was not aware, the killing of Mr. Dunn had not occurred during the course of any felony which Defendant intended to commit. At the conclusion of this inquiry, Defendant stated that he had discussed this strategy with his trial counsel and agreed that the strategy in question should be the one employed in his defense. As a result, given that his trial counsel made the challenged admissions of fact with his consent, Defendant is not entitled to relief from the trial court's judgment on the basis of the principle enunciated in *Harbison* and its progeny.

### 3.  Challenge to Trial Counsel's Defense Strategy

[2]  Secondly, Defendant contends that his trial counsel provided him with deficient representation because the approach that she adopted in seeking to persuade the jury to refrain from convicting Defendant of any criminal offense lacked adequate factual and legal support. More specifically, Defendant contends that his trial counsel's decision to adopt a strategy of conceding that Defendant was present at the scene of Mr. Dunn's death and that he thought that he was supposed to be engaging in an effort to rob Mr. Dunn and of promising to present expert testimony concerning the effect of Defendant's involvement in gang-related activities constituted an unreasonable strategic choice for which there was no evidentiary or legal support. We do not believe that Defendant's challenge to the defense strategy adopted by his trial counsel, to which he consented during the course of the trial proceedings, is ripe for decision on direct appeal.

Although the parties expended considerable energy attempting to either attack or defend the strategic decisions that Defendant's trial counsel made in advance of and during Defendant's trial, we do not believe that we are currently in a position to adequately evaluate the extent, if any, to which those decisions resulted in the provision of constitutionally

deficient representation. Admittedly, the theory of defense adopted by Defendant's trial counsel is difficult to state in a simple and concise manner, particularly as applied to the issue of Defendant's guilt of first degree murder under the felony murder rule. On the other hand, the record does not provide sufficient information to permit us to evaluate the extent to which other strategic options were realistically available to Defendant and what considerations Defendant's trial counsel weighed in the course of determining that the strategy that she adopted, despite its obvious difficulties, was more likely to be successful than other available alternatives. In the absence of additional information concerning the nature and extent of the investigative activities and legal research undertaken by Defendant's trial counsel and the nature and strength of the alternative defense strategies realistically available to Defendant, we can do little more than speculate as to whether the defense presented at Defendant's trial amounted to constitutionally deficient representation or whether any deficiencies in the representation that Defendant did receive prejudiced him.

We should not, for obvious reasons, engage in such speculation. *State v. Al-Bayyinah*, 359 N.C. 741, 752-53, 616 S.E.2d 500, 509-10 (2005) (dismissing an ineffective assistance of counsel claim asserted on direct appeal without prejudice because "[t]rial counsel's strategy and the reasons therefor [were] not readily apparent from the record," necessitating the development of "more information . . . [in order] to [permit a] determin[ation as to whether] defendant's claim satisfies the *Strickland* test"), *cert. denied*, 547 U.S. 1076, 126 S. Ct. 1784, 164 L. Ed. 2d 528 (2006); *State v. Campbell*, 359 N.C. 644, 693, 617 S.E.2d 1, 31 (2005) (dismissing an ineffective assistance of counsel claim asserted on direct appeal without prejudice because, from the record before the Court, it could only "speculate as to why defense counsel chose to argue self-defense"), *cert. denied*, 547 U.S. 1073, 126 S. Ct. 1773, 164 L. Ed. 2d 523 (2006); *State v. Loftis*, 185 N.C. App. 190, 203, 649 S.E.2d 1, 10 (2007) (dismissing an ineffective assistance of counsel claim asserted on direct appeal without prejudice on the grounds that the Court lacked "sufficient information regarding trial counsel's strategy"). The inappropriateness of speculating about the suitability of trial counsel's theory of defense underlies the Supreme Court's acknowledgement that, in many cases, " 'defendants likely will not be in a position to adequately develop many [ineffective assistance of counsel] claims on direct appeal.' " *State v. Long*, 354 N.C. 534, 540, 557 S.E.2d 89, 93 (2001) (quoting *Fair*, 354 N.C. at 167, 557 S.E.2d at 525). As a result, given our determination that we cannot adequately evaluate the merits of Defendant's challenge to the reasonableness of the strategy adopted by his trial counsel in the absence of additional information, including her failure to present expert testimony concerning the impact of gang involvement on Defendant's activities, we

conclude that this aspect of Defendant's ineffective assistance of counsel claim should be dismissed without prejudice to Defendant's right to assert this claim in a subsequent motion for appropriate relief.

### B.  Mandatory Life Without Parole Sentence

[3]  Secondly, Defendant contends that the trial court violated his state and federal constitutional right to be free from cruel and unusual punishment by imposing a mandatory sentence of life imprisonment without the possibility of parole upon him despite the fact that he was under 18 years of age at the time of Mr. Dunn's murder. We agree.

The Eighth and Fourteenth Amendments to the United States Constitution prohibit the imposition of cruel and unusual punishments upon convicted criminal defendants. U.S. Const. amend. VIII; U.S. Const. amend. XIV; *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 1190, 161 L. Ed. 2d 1, 15-16 (2005). Among other things, the "Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 2469, 183 L. Ed. 2d 407 (2012). As a result of the fact that the United States Supreme Court's decision in *Miller* was announced while this case was pending on direct review, the principle enunciated in that decision applies to the resolution of this case. *Id.*

The trial court's judgment requiring that Defendant, who had not attained the age of 18 at the time that Mr. Dunn was killed, be imprisoned for the remainder of his life without the possibility of parole was imposed in accordance with N.C. Gen. Stat. § 14-17(a), which provides that an individual who was less than 18 years of age at the time of the crime for which he or she was convicted and was found guilty of first degree murder would automatically be sentenced to life imprisonment without the possibility of parole. The Supreme Court's decision in *Miller* clearly holds that such a mandatory life without parole sentence for an individual convicted of committing a crime which occurred before he or she turned 18 years of age constituted the imposition of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 27 of the North Carolina Constitution. *Id.*; U.S. Const. amend. VIII; N.C. Const. Art. I, § 27. As a result, the mandatory sentence of life imprisonment without the possibility of parole that the trial court imposed upon Defendant pursuant to N.C. Gen. Stat. § 14-17(a) cannot withstand constitutional scrutiny and must be vacated.

In the aftermath of the decision in *Miller*, the General Assembly enacted 2012 N.C. Sess. L. c. 148, which governs the sentencing of

**STATE v. PEMBERTON**

[228 N.C. App. 234 (2013)]

individuals "under the age of 18 at the time of the offense" who would otherwise be subject to a mandatory sentence of life imprisonment without the possibility of parole in accordance with N.C. Gen. Stat. § 14-17(a). Pursuant to N.C. Gen. Stat. § 15A-1340.19B(a)(1), "[i]f the sole basis for conviction of a count or each count of first degree murder was the felony murder rule, then the court shall sentence the defendant to life imprisonment with parole," which is defined in N.C. Gen. Stat. § 15A-1340.19A as "mean[ing] that the defendant shall serve a minimum of 25 years imprisonment prior to becoming eligible for parole." According to 2012 N.C. Sess. L. c. 148, s.3, the statutory provisions enacted in 2012 N.C. Sess. L. c. 148 apply "to any resentencing hearings required by law for a defendant who was under the age of 18 years at the time of the offense, was sentenced to life imprisonment without parole prior to the effective date of this act, and for whom a resentencing hearing has been ordered." For that reason, since Defendant is entitled to be resentenced by virtue of *Miller* and since Defendant was convicted of first degree murder solely on the basis of the felony-murder rule, he must be resentenced to life imprisonment with parole in accordance with N.C. Gen. Stat. § 15A-1340.19B(a). As a result, the trial court's sentence should be vacated and this case should be remanded to the Wake County Superior Court for the entry of a judgment sentencing Defendant to life imprisonment with parole. *State v. Lovette*, __ N.C. App. __, __, 737 S.E.2d 432, 441-42 (2013) (holding that a defendant impermissibly sentenced to life imprisonment without the possibility of parole in violation of *Miller* should be awarded a new sentencing hearing to be conducted in accordance with the provisions of N.C. Gen. Stat. § 15A-1340.19B).

### III. Conclusion

Thus, for the reasons set forth above, we hold that Defendant is not entitled to relief from the trial court's judgment based upon his trial counsel's alleged admission of guilt, that Defendant's challenge to the strategy adopted by his trial counsel has been prematurely asserted on direct appeal and should be dismissed without prejudice to his right to assert that claim in a future motion for appropriate relief, that the trial court's sentence should be vacated, and that this case should be remanded to the Wake County Superior Court for resentencing. As a result, the trial court's sentence is vacated and this case should be, and hereby is, remanded to the Wake County Superior Court for a new sentencing hearing.

NO ERROR IN PART; DISMISSED IN PART; VACATED AND REMANDED FOR RESENTENCING IN PART.

Judges ROBERT C. HUNTER and STROUD concur.