ELMORE, Judge.
 

 *742
 
 Ernest Lee Goodman (defendant) appeals from a judgment entered after a jury convicted him of assault with a deadly weapon with intent to kill and inflicting serious bodily injury. His sole contention on appeal is that the trial court erred by allegedly failing to exercise its discretion when it responded "no" to a juror's inquiry at the start of the third day of trial about whether jurors may question trial witnesses. Because defendant failed to object at trial, he failed to preserve for our review any issue arising from the trial court's denial of the juror's request. Recognizing this, defendant alternatively requests that we invoke our discretionary authority under Appellate Rule 2 to suspend the issue-preservation requirements of Appellate Rule 10 and conduct a merits-review of his argument. Because defendant has failed to demonstrate
 
 *743
 
 his alleged error warrants the extraordinary measure of suspending our Appellate Rules, and because we conclude it would be inappropriate to invoke Appellate Rule 2 in this particular case, in our discretion we decline defendant's request. Accordingly, we dismiss his unpreserved alleged error and appeal.
 
 *793
 

 I. Background
 

 During the evening of 30 January 2009, Blane Riddick, a morbidly obese paraplegic, was shot twelve times in his bedroom while he was bedridden in his family's home in Gates, North Carolina. About twenty years earlier, Riddick was shot in the back while living in New York City, rendering him a paraplegic. He moved back into his parents' house in North Carolina a few years later. As a result of his New York gunshot wound, Riddick required substantial medical care and assistance. Rhonda Hurdle, an ex-girlfriend to both Riddick and defendant, served as Riddick's nurse and regularly attended to his medical needs for payment.
 

 The State's evidence tended to show that, on the evening of the shooting, defendant dropped Hurdle off at Riddick's house to attend to his medical needs. Once Hurdle finished changing Riddick's bandages and bedding about an hour or two later, Riddick asked his brother and neighbor, Ben Riddick, to drive Hurdle home. As soon as Ben dropped off Hurdle, she called Riddick. While Hurdle was speaking on the phone with Riddick, she heard three gun shots, immediately hung up, and called 911.
 

 The State's evidence also tended to show that Riddick's neighborhood friend, Patricia Howell, believed she saw defendant running from Riddick's home around the time of the shooting; that defendant's vehicle was found abandoned in a field near Riddick's house; that on two separate occasions, defendant confessed to two of his ex-girlfriends, Hurdle and April Pierce, that he shot Riddick and threatened their lives if they ever told anyone; and that, after shooting Riddick, defendant fled on foot, buried his guns and clothes in the woods, hitched a ride home from a school friend, Damon Boone, who just happened to be driving by and saw defendant walking down the street, and then defendant hid out in his camper for three days.
 

 After the first two days of trial, the State had called eight witnesses, including Ben, Howell, Pierce, Hurdle, and Boone, and three initial responders. Near the end of the second day of trial, the State was directly examining its ninth and final witness, Captain Glynda Parker of the Gates County Sheriff's Department. Captain Parker testified that she arrived to the scene after the initial responding officers and EMS,
 
 *744
 
 observed the paramedics treat Riddick and get him ready for transport to a hospital, and then spoke with the initial responding officers, who explained they found a shell casing in the hallway and a bullet hole in the television. Captain Parker described the layout of Riddick's house and laid a foundation for about twenty photographs she took at the crime scene, including the several guns, bullets, and bullet holes found at the residence. These photographs were introduced into evidence and published to the jury, ending the second day of trial.
 

 At the start of day three, a juror asked the trial judge whether the jury may question trial witnesses, and the judge replied that they could not:
 

 THE COURT: Good morning. I understand that somebody had a question they wanted to ask me? Your name?
 

 JUROR SEVEN: My name is Jack Werk. I had a question. Do we get to ask any questions?
 

 THE COURT: No, sir. You are a juror. You are a fact finder. You are not a lawyer, you don't get to question. No, sir. Anything else?
 

 JUROR SEVEN: No, I guess that answered it. Thank you.
 

 THE COURT: Thank you. Call your next.
 

 [THE STATE]: Ms. Parker.
 

 THE COURT: Ma'am, if you will come back to the stand.
 

 Defendant lodged no objection to the court's response, and there were no other jury requests to question witnesses. The State reminded Captain Parker that "yesterday, when we were finishing up I think just [sic] introduced the photographs you had taken there at the crime scene and see [sic] where [Riddick's] room was." Captain Parker resumed her testimony, explaining the grouping of Riddick's gunshot wounds, the types of bullets she collected from the crime scene, and how one of the five bullets was different from the others. She then testified about written statements she collected from Hurdle, Pierce, Boone, and defendant during her
 
 *794
 
 investigation. The State rested its case, defendant presented no evidence, and the jury was excused for the charge conference.
 

 On day four, the trial court instructed the jury on the law. The jury deliberated from 10:29 a.m. to 6:57 p.m., sending twelve notes to the court. It asked for and received copies of the written statements from Hurdle, Pierce, Boone, and defendant that were introduced during
 
 *745
 
 Captain Parker's testimony on the third day of trial. The jury notes also indicated that it was deadlocked, first at 8-4, then at 9-3, at 9-3 again, at 10-2, at 10-2 again, and then at 11-1. Eventually, the jury reached a unanimous split verdict finding defendant guilty of assault with a deadly weapon with intent to kill and inflict serious injury, and not guilty of attempted murder. The trial court sentenced defendant within the presumptive range of 83 to 109 months of active incarceration. Defendant gave oral notice of appeal.
 

 II. Analysis
 

 Defendant's sole argument on appeal is that the trial court erred by allegedly failing to exercise its discretion when it responded "no" to juror seven's question about whether jurors were allowed to question trial witnesses. The State retorts that this issue has not been preserved for appellate review because defendant failed to object, and we agree.
 

 Under the North Carolina Rules of Appellate Procedure,
 

 In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion.
 

 N.C. R. App. P. 10(a)(1).
 

 In
 
 State v. Parmaei
 
 ,
 
 180 N.C. App. 179
 
 ,
 
 636 S.E.2d 322
 
 (2006),
 
 disc. rev. denied
 
 ,
 
 361 N.C. 366
 
 ,
 
 646 S.E.2d 537
 
 (2007), we held that a defendant's failure to object after a trial judge denies a jury request to question trial witnesses forecloses appellate review of any alleged error arising from that denial.
 
 Id.
 
 at 184,
 
 636 S.E.2d at 325
 
 . There, the jury sent a note at the beginning of trial inquiring whether it was allowed to ask witnesses follow-up questions, and the trial judge responded "no."
 

 Id.
 

 On appeal, the defendant argued the trial court committed plain error by prohibiting the jury from questioning witnesses. Because the "[d]efendant failed to object to the trial judge's denial of the jury's request to question trial witnesses[,]" we held that his "assigned error [was] not preserved for our review,"
 

 id.
 

 (citing N.C. App. R. App. P. 10(a)(1) ), and, further, that it was "not reviewable under the limited scope of plain error review."
 

 Id.
 

 Accordingly, we dismissed it.
 
 Id.
 
 at 184-85,
 
 636 S.E.2d at 325
 
 .
 

 *746
 
 Here, juror seven asked the trial judge: "Do we get to ask any questions?" and the judge responded: "No, sir. You are a juror. You are a fact finder. You are not a lawyer, you don't get to question. No, sir." Defense counsel never objected. Accordingly, under
 
 Parmaei
 
 , defendant's failure to object after the trial court denied juror seven's request to question witnesses renders unpreserved any issue arising from that denial.
 
 See
 

 In re Civil Penalty
 
 ,
 
 324 N.C. 373
 
 , 384,
 
 379 S.E.2d 30
 
 , 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, ... a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court." (citations omitted));
 
 see also
 
 N.C. R. App. P. 10(a)(1).
 

 Recognizing that his failure to object may have foreclosed appellate review, defendant asks us to invoke Appellate Rule 2 to review the merits of this alleged error. In our discretion, we respectfully decline defendant's request.
 

 This Court may invoke our discretionary authority under Appellate Rule 2 "[t]o prevent manifest injustice to a party," by "suspend[ing] or vary[ing] the requirements or provisions of any of [the appellate] rules," including Rule 10(a)(1)'s issue-preservation requirement. N.C. R. App. P. 2. But Appellate Rule 2 is limited to " 'exceptional circumstances, ... and [should be invoked] only in such instances.' "
 

 *795
 

 State v. Campbell
 
 , --- N.C. ----, ----,
 
 799 S.E.2d 600
 
 , 602 (2017) (emphasis omitted) (quoting
 
 Steingress v. Steingress
 
 ,
 
 350 N.C. 64
 
 , 66,
 
 511 S.E.2d 298
 
 , 299-300 (1999) ). The decision of whether to invoke Appellate Rule 2 "must necessarily be made in light of the specific circumstances of individual cases and parties," and "whether an appellant has demonstrated that his matter is the rare case meriting suspension of our appellate rules is always a discretionary determination to be made on a case-by-case basis."
 

 Id.
 

 at ----,
 
 799 S.E.2d at 602, 603
 
 (citations and footnote admitted).
 

 Defendant concedes, and we agree, that "[i]t is impossible to determine what questions juror seven would have posed;" therefore, "this Court is unable to determine exactly how the trial court's [alleged] error might have prejudiced [defendant]." Nonetheless, defendant advances several creative hypothetical juror questions, and requests that we invoke Appellate Rule 2 because "[t]he trial court clearly failed to exercise its discretion and given the lengthy jury deliberations and the logically inconsistent verdict, a different result very well may have been obtained had the jurors been allowed to elicit additional evidence." Defendant's argument fails because it is purely speculative.
 

 Based on the timing of the juror's inquiry-at the start of the third day of trial, after eight witnesses had already testified and in the middle
 
 *747
 
 of Captain Parker's testimony about the crime scene photographs-combined with its vague nature-whether, generally, the jury may question witnesses-the record provides no indication at all about the subject matter of any question juror seven, or any other juror, might have wished to pose of which witness, or what additional evidence might have been elicited. We conclude that defendant has failed to demonstrate that "his matter is the rare case meriting suspension of our appellate rules[,]"
 
 Campbell
 
 , --- N.C. at ----,
 
 799 S.E.2d at 603
 
 , and based upon the particular circumstances of this case, we decline to exercise our discretionary authority under Appellate Rule 2.
 

 We note, however, that " 'the propriety of juror questioning of witnesses is within the sound discretion of the trial court.' "
 
 State v. Elliott
 
 ,
 
 360 N.C. 400
 
 , 413,
 
 628 S.E.2d 735
 
 , 744 (2006) (quoting
 
 State v. Howard
 
 ,
 
 320 N.C. 718
 
 , 725,
 
 360 S.E.2d 790
 
 , 794 (1987) ). Our Supreme Court has instructed that "[w]hile it may be permissible in the discretion of the trial court to allow jurors to orally ask witnesses questions, 'the better practice is for the juror to submit written questions to the trial judge who should have a bench conference with the attorneys, hearing any objections they might have.' "
 
 Id.
 
 at 413,
 
 628 S.E.2d at 744-45
 
 (quoting
 
 Howard
 
 ,
 
 320 N.C. at 726
 
 ,
 
 360 S.E.2d at
 
 795 ). "The judge[ ] ... should then ask the questions of the witness. Questions should ordinarily be for clarification and the trial judge should exercise due care to see that juror questions are so limited."
 
 Howard
 
 ,
 
 320 N.C. at 726
 
 ,
 
 360 S.E.2d at 795
 
 . In our opinion, rather than a trial judge simply replying "no" in response to jury requests to question trial witnesses, we believe a better practice would be to ask the juror to submit written questions, as suggested by our Supreme Court in
 
 Elliott
 
 .
 

 III. Conclusion
 

 Because defendant failed to object after the trial judge denied the juror's request to question trial witnesses, he failed to preserve his alleged error for our review. Defendant failed to satisfy his burden of demonstrating that his case warrants suspending our Appellate Rules in order to conduct a merits-review of his unpreserved alleged error, and, given the pure speculation of what question any juror(s) might have sought to pose of which witness(es), in our discretion we decline to invoke Appellate Rule 2. We therefore dismiss his alleged error and appeal.
 

 DISMISSED.
 

 Judges STROUD and TYSON concur.