IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 23-975

Filed 31 December 2024

Wake County, Nos. 19 CRS 218814-15

STATE OF NORTH CAROLINA

v.

ROLAND WAYNE LACURE and
ELIJAH UMELO

Appeal by defendants from judgment entered 2 May 2022 by Judge Keith O. Gregory in Wake County Superior Court. Heard in the Court of Appeals 25 September 2024.

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Sterling Rozear, for Defendant Elijah Umelo.*

*Anne Bleyman for Defendant Roland Lacure.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Caden W. Hayes, for the State.*

DILLON, Chief Judge.

Defendants Roland Lacure and Elijah Umelo were each indicted for first degree murder for the death of Desmond Jenkins.

The State's evidence showed as follows: On the night of 9 August 2019, Mr. Jenkins was fatally shot as he was about to enter his home after being dropped off by a friend. Unbeknownst to Mr. Jenkins, Defendants, driving separate vehicles but

FaceTiming each other, followed Mr. Jenkins to his home. Immediately following the shooting, Defendants sped off from the scene in their separate vehicles.

The trial court ordered Defendants' cases to be consolidated for trial over Defendants' objections. During trial, the State presented thirty-three witnesses and admitted sixty-four exhibits into evidence. At the close of trial, Defendant Lacure's attorney argued that Defendant Umelo had shot and killed the victim. Inversely, Defendant Umelo's counsel argued that Defendant Lacure shot and killed the victim.

The jury found both Defendants guilty as charged. The trial court sentenced both men to life in prison without the possibility of parole with an additional special condition stating Defendants were not allowed to receive vocational or educational classes for the first twenty-two years of their sentences. Both Defendants appealed.

## I. Analysis

Some of the issues were raised by both Defendants, while some were raised by one Defendant. We address each issue in turn.

## A. Admission of Video Evidence

Both Defendants argue, in their respective briefs, that the trial court erred in allowing surveillance videos to be admitted into evidence, contending the witnesses had no personal knowledge of the videos to prove authenticity.

We review authentication of evidence *de novo*. *State v. Clemons*, 274 N.C. App. 401, 409 (2020).

There are multiple ways in which video can be authenticated for trial. In *State*

*v. Snead*, our Supreme Court recognized the example listed in Rule 901(b)(9) applies to surveillance videos: "Recordings such as a tape from an automatic surveillance camera can be authenticated as the accurate product of an automated process under Rule 901(b)(9)." 368 N.C. 811, 814 (2016). "Evidence that the recording process is reliable and that the video introduced at trial is the same video that was produced by the recording process is sufficient to authenticate the video and lay a proper foundation for its admission as substantive evidence." *Id.*

Here, Defendants contend that five surveillance videotapes were not properly authenticated: (1) the Speedway gas station, (2) Star Bar, (3) Stone Systems, (4) Tobacco House, and (5) 64 Business Center. All five surveillance videos were introduced during different witness testimony and tended to track Defendants' movements on the night of Mr. Jenkins's killing. Each witness testified to the reliability of the surveillance videotaping systems and that the videos that were at trial accurately depicted the original videos recorded by the surveillance systems. According to the rule set by our Supreme Court in *Snead*, we conclude the information provided by each witness was sufficient to authenticate the surveillance videos. Therefore, we hold the trial court did not err in concluding that the video evidence was properly authenticated.

### B. Officer Morton's Testimony

Both Defendants contend that the trial court erred by admitting an officer's testimony regarding data from cell towers showing their movements on the night of

Mr. Jenkins's killing, because the information went beyond the knowledge of a lay person and the officer was not tendered as an expert witness.

Expert testimony is governed by Rule 702 and states that:

> If *scientific, technical or other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise . . . .

N.C.G.S. § 8C-1, Rule 702(a) (2019) (emphasis added). Based on this rule, a witness need only be tendered as an expert if the topic which they speak on is scientific, technical, or required specialized knowledge.

Neither party cites a published case from North Carolina determining whether an officer's testimony regarding the general location of a suspect based on cell tower data constitutes lay testimony or expert testimony. We note that in an unpublished opinion, a panel of our Court held that such testimony did not constitute expert testimony as it "did not require the use of 'scientific, technical, or other specialized knowledge.' " *State v. Joyner*, 280 N.C. App. 561 (2021) (quoting Rule 701(a)) (unpublished).

The Iowa Supreme Court considered the issue and wrote a lengthy opinion detailing how courts around the country have handled the issue. That Court concluded that an officer's testimony about the general location of a suspect at a particular time based on cell tower data is lay testimony, whereas testimony about how a cell tower functions or why cell phones ping off a particular tower is expert

testimony:

> Having surveyed the various approaches, we agree with the growing majority of jurisdictions that draw the line between lay and expert testimony involving historical cell site data based on the underlying information supporting the testimony. If the witness conveys inferences that can be drawn from factual information contained in the phone records using "a process of reasoning familiar in everyday life," such as plotting data on a map, the testimony qualifies as lay testimony. This includes opinions about the generalized location of a phone within the coverage area of the pinged tower—as long as the opinion is premised on factual information from the phone company. However, when a witness relies on specialized knowledge about how a cell tower functions, such as the numerous factors that determine why a phone pings off one cell tower instead of another, to opine about the coverage area of a tower or a cell phone's location, that witness must first be qualified as an expert.

*State v. Boothby*, 951 N.W.2d 859, 876 (Iowa 2020). The Court concluded that an officer's testimony that a suspect was in the general area at a particular time and then moved to another general area, all based on reviewing cell tower data, constituted lay testimony. *Id.*

We are persuaded by the opinions in *Joyner* and *Boothby*. We expressly adopt the analysis and holding in *Boothby* and conclude that much of Officer Morton's testimony was properly admitted as lay testimony. Portions of Officer Morton's testimony, however, goes beyond what may be considered lay testimony. However, to the extent said portions constituted expert testimony, we conclude Defendants were not prejudiced, given the other evidence—including the video evidence

addressed in the previous section of this opinion—which tended to place each Defendant in front of Mr. Jenkins's home on the night of the shooting.

### C. Special Sentencing Condition

Each Defendant argues that the trial court erred during sentencing by prohibiting him from receiving educational or vocational training during the first twenty-two years of his imprisonment. The State concedes this error. We agree.

Whether or not the trial court is acting within its authority under statute is a question of statutory interpretation. "The interpretation of a statute, which is a question of law, is reviewed de novo." *State v. Rollinson*, 383 N.C. 528, 531 (2022).

The statutes which govern a trial court's authority in sentencing are found in the North Carolina General Statutes. Rule 15A-1340.13 *et seq.* provides proper procedures and guidelines for sentencing, whereas Rule 15A-1340.17 provides a list of punishments available to a sentencing judge.

Here, during sentencing, the trial court stated that "[God] placed it on [his] heart to tell [Defendants] for the first 22 years of their sentence" they were not to think about engaging in vocational training or educational classes.

Nowhere in our General Statutes is there language providing a trial judge the authority to restrict a defendant's rights to vocational training or educational classes while incarcerated. Privileges and restrictions of an incarcerated person are determined by the department of adult corrections. *See* N.C.G.S. §§ 148-11(a), 148-13, 148-22.1. We conclude the trial court went beyond its scope of authority and,

therefore, reverse the special condition in the judgments restricting Defendants' ability to engage in vocational training or educational classes.

### D.     Ineffective Assistance of Counsel

Defendant Umelo argues in his brief that he received ineffective assistance of counsel, contending that his counsel's theory of defense had no basis in law and his closing argument admitted guilt without his consent.

To obtain relief based on an argument of ineffective assistance of counsel, a defendant "is required to demonstrate that his trial counsel's performance was deficient and that the deficient performance prejudiced the defense." *State v. Pemberton*, 228 N.C. App. 234, 240 (2013) (internal citations omitted).

The United States Supreme Court has stated that a defendant must satisfy a two-part test to have a valid claim for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant is prejudiced when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The North Carolina Supreme Court has also stated that "[c]ounsel is given wide latitude in matters of

strategy, and the burden to show that counsel's performance fell short of the required standard is a heavy one for defendant to bear." *State v. Fletcher*, 354 N.C. 455, 482 (2001).

We have stated that

> [i]n general, claims of ineffective assistance of counsel should be considered through motions for appropriate relief and not on direct appeal. This is so because on direct appeal, review is limited to the cold record, and the Court is without the benefit of information provided by defendant to trial counsel, as well as defendant's thoughts, concerns, and demeanor that could be provided in a full evidentiary hearing on a motion for appropriate relief.
>
> Only when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing will an ineffective assistance of counsel claim be decided on the merits on direct appeal.

*State v. Edgar*, 242 N.C. App. 624, 632 (2015) (internal citations and marks omitted).

Here, Defendant Umelo argues that his trial counsel was ineffective for two reasons: (1) counsel's theory of defense has no basis of law and (2) his closing argument amounted to an implied admission of guilt. Defendant Umelo contends that the following argument made in his counsel's closing argument implicated guilt:

> You've got to step out of circumstantial evidence and delve into conjecture to come up with, oh, the communication going on between those two that evening was coming up with their common plan to murder someone. For all we know, goofball over here is saying, her, let's just go out there and cause some mischief. He's not paranoid. He's just an idiot. He's an idiot who walks around with his gun,

takes selfies with his dogs and his gun, acting like a complete moron. He's not paranoid, he's stupid.

For all we know, he said let's go up there and raise a little hell. Mr. Lacure and his girlfriend had been robbed. It's like, um-hmm, yeah, sure. Let's go. Let's go. For all we know, he's got one plan, and he's got another plan for all we know. They've got to prove to you that that plan is the same plan, and they haven't done it because we don't have the technology to be able to -- I don't think they do. We don't have the evidence of knowing what the communication was between the two of them. We just don't. That's going to give you some kind of doubt.

. . .

What I would suggest to you is that the bang, bang, bang, bang, 16 times, those shell casings right there that were on the floor came from here. That's been proven. But what's going on over here? Idiot goofball over there with his .40 that he likes to walk around with, acting the idiot, he's, like, 'Whoa, what's going on?'

He pulls his gun out, and he starts firing his gun all over the place. We don't know where he fired the gun.

. . .

But it's interesting to me that -- clearly, that the firing that starts this thing -- the firing thing is Mr. Lacure's right here, bang, bang, bang. Okay? Bang. And then idiot over here [referring to Mr. Umelo], like, "Whoa, I'm just going to start firing my gun too." Is he also firing at Desmond Jenkins? Can he even see Desmond Jenkins from where he is? Is that aiding him with something he's already started doing? Is it encouraging him in something he's already started doing? No. There's no evidence of the aiding or the encouraging. The best that they have got -- again, I'm not conceding anything. I refuse to concede anything; right?

The best they've got is that Elijah Umelo was out there,

might have been out there.  You determine that.

Based on our review of the cold record, we conclude that Defendant Umelo

failed to meet the burden of proof to show that his counsel acted in such an

unprofessional manner that Defendant was prejudiced.  For the foregoing reasons,

we overrule Defendant's ineffective assistance of counsel claim.

### D.  Defendant Lacure's Motion to Sever

Finally, Defendant Lacure argues that the trial court erred by denying his

motion to sever his trial from that of Defendant Umelo.  We review this argument for

abuse of discretion.  *State v. Carson*, 320 N.C. 328, 335 (1987).

Defendant Lacure contends that Defendants were antagonistic towards each

other.  However, our Supreme Court has stated that "antagonistic defenses [do] not,

standing alone, warrant severance."  *State v. Golphin*, 352 N.C. 364, 400.  Rather, the

test for whether to deny joinder or grant severance is determined by looking at

"whether the conflict in defendants' respective positions at trial is of such nature that,

considering all of the other evidence in the case, defendants were denied a fair trial."

*State v. Lowery*, 318 N.C. 54, 59 (1986).  Our Supreme Court has also stated that:

> To determine whether the positions of the defendants are
> so antagonistic, or conflicting, as to be prejudicial, this
> Court has stated the trial court should grant severance
> when necessary to avoid an evidentiary battle between the
> defendants where the state simply stands by and witnesses
> a combat in which the defendants [attempt] to destroy each
> other.

*Golphin*, 352 N.C. at 400 (internal quotations omitted).

Defendant Lacure argues that in closing arguments, each defense counsel accused the other defendant of being the one who was guilty of murder. However, it is well established that "[c]losing arguments are not evidence." *State v. Reber*, 386 N.C. 153, 163 (2024) (citation omitted).

We conclude that the trial court did not abuse its discretion in denying Defendant Lacure's motion to sever.

## II.    Conclusion

We reverse the portions of the judgments which impose the special condition restricting Defendants' ability to participate in vocational training or educational classes. We, otherwise, conclude Defendants received a fair trial, free of reversible error.

NO ERROR IN PART, REVERSED IN PART.

Judges MURPHY and THOMPSON concur.